**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **LLOYD RANDALL ANDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:12-cv-01312** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **TOL, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM</u>**

Plaintiff Lloyd Randall Anderson has filed a Motion for Temporary Restraining Order and Preliminary Injunctive Relief ("Motion for Preliminary Injunction"), to which the defendant, TOL, Inc. ("TOL"), filed a Response in opposition (Docket No. 23), and Anderson filed a Reply (Docket No. 34). TOL has filed a Motion to Dismiss or Transfer (Docket No. 16), to which Anderson filed a Response in opposition (Docket No. 26), and TOL filed a Reply (Docket No. 40). Anderson has also filed a Motion for Leave to File Motion for Partial Summary Judgment (Docket No. 33), to which TOL has filed a Response in opposition (Docket No. 41).

On February 7, 2013, the court held a preliminary injunction hearing ("PI Hearing"). At the conclusion of that hearing, the court ruled from the bench and issued a preliminary injunction against TOL and Overbreak, LLC. This Memorandum further explains the court's reasoning for that decision. Furthermore, for the reasons explained herein, the Motion to Dismiss or Transfer and the Motion for Leave to File a Motion for Partial Summary Judgment will both be denied without prejudice.

1

I.      **Factual Background**[1]

This case involves claims by an inventor, Lloyd Randall Anderson, who claims that TOL

is liable to him for patent infringement, breach of contract, and fraud.  Anderson was the inventor

of patented technology for rigid helium balloons that Overbreak, LLC ("Overbreak") utilized to

create a popular children's toy called the "HoverDisc."

On February 25, 2002 – before Anderson had applied for any patents concerning the rigid

helium balloons – Anderson filed a voluntary petition for Chapter 13 Bankruptcy.  *See In Re*

*Anderson*, No. 3:02-bk-02305 (Bankr. M.D. Tenn. Feb. 25, 2002) ("Bankruptcy Case").[2]

On February 5, 2003, Anderson filed Articles of Organization for "PhoenixArts, LLC"

("PhoenixArts"), a Tennessee limited liability company for which Anderson served as the

President and sole owner.  (*See* O'Brien Decl. II, at Ex. 1 (pp. 10-11); Anderson Decl. ¶ 4;

Verified Compl. ¶ 14).  On February 14, 2003, Anderson filed a patent application with the

United States Patent and Trademark Office ("USPTO") in his own name, seeking a patent for his

_____

[1]The parties presented witnesses and introduced documents into evidence at the PI Hearing.  (*See* Docket Nos. 37 (list of witnesses and exhibits) and 39 (PI Hearing transcript)). The parties have also introduced various other sworn materials, including: (1) Anderson's Verified Complaint (Docket No. 1) (with associated attachments); (2) a declaration from Dayne Sieling in support of TOL's Motion to Dismiss or Transfer (Docket No. 18, Attachment 1) ("Sieling Decl. I"); (3) a declaration from Anderson in support of his request for a preliminary injunction (Docket No. 19) ("Anderson Decl."); (4) declarations from Sieling and Sean D. O'Brien in support of TOL's Response in opposition to Anderson's request for preliminary injunctive relief (Docket No 23, Exs. 1 ("Sieling Decl. II") and 2 ("O'Brien Decl. I")); and (5) a declaration from O'Brien in support of TOL's Reply concerning the Motion to Dismiss or Transfer (Docket No. 40) ("O'Brien Decl. II").  Unless otherwise noted, this background section is based on the sworn materials and testimony presented to the court.

[2]TOL filed a copy of the bankruptcy court docket and certain entries contained therein as an exhibit to the Second O'Brien Declaration.  (*See* O'Brien Decl. II, Ex. 2.)  The court takes judicial notice of these materials.

rigid helium balloon invention (hereinafter, "838 Patent Application"). (*See* Verified Compl., Ex. B, at p. 1.) On February 22, 2003, PhoenixArts entered into a License Agreement with Overbreak, in which PhoenixArts purported to license the 838 Patent Application and all related applications and patents to Overbreak, in return for Overbreak's promise to pay PhoenixArts royalties based on its "Net Sales" of the HoverDisc. (Docket No. 5 (filed under seal) ("License Agreement").) The USPTO ultimately issued the 838 Patent in Anderson's name on December 9, 2003 ("838 Patent"). (Verified Compl., Ex. B, at p. 1.)

On August 19, 2003, Anderson filed a follow-on patent application ("151 Patent Application"), which the USPTO granted and issued on May 29, 2007 ("151 Patent"). (*Id.*, Ex. B, at p. 12.) On November 12, 2003, Anderson applied for a patent related to the 838 Patent (hereinafter, "487 Patent Application"), which the USPTO granted and issued on February 6, 2007 ("487 Patent Application"). (*Id.*)

Anderson has claimed that he orally conveyed to PhoenixArts the right to sub-license the Patents – including, apparently, the right to sub-license Anderson's interest in the Patent Applications while they were pending. (*See* Docket No. 19, Anderson Decl. ¶¶ 4-5; PI Hearing Transcript at 35:16-25; 98:24-99:5; Verified Compl. ¶¶ 14-16.) Anderson has not stated when he entered into this alleged oral licensing agreement with PhoenixArts. Anderson did not disclose the Patent Applications or the Patents at any time during the five-year duration of his Chapter 13 bankruptcy plan.

At any rate, pursuant to the License Agreement, Overbreak began manufacturing and selling HoverDiscs, which became a popular children's toy. (Sieling Decl. I ¶ 4; Sieling Decl. II ¶ 4.) Overbreak remitted approximately $1.5 million in royalties to Anderson through 2007.

(*Id.*)[3]  However, between 2005 and 2007, Anderson complained to Overbreak that it was failing to pay him sufficient royalties by improperly deducting non-allowable expenses from the quarterly payments, in violation of the License Agreement.  (Sieling Decl. I ¶ 4; Verified Compl. ¶¶ 23-32 (with associated exhibits); PI Hearing Exs. 2-7; PI Hearing Transcript 47:5-48:10, 49:16-56:9.)  It does not appear that Overbreak seriously disputes that, under the letter of the License Agreement, the expenses were not allowable.  (*See, e.g.*, PI Hearing, Ex. 5 (2/21/07 Letter from Elizabeth Risha to Paige Mills); PI Hearing Transcript 156:9-14; 157:2-5.)  Although Overbreak never paid the disputed amounts, Anderson did not pursue the dispute any further, at least at the time.  The parties vigorously dispute whether a March 1, 2007 demand letter sent by Anderson's counsel on his behalf terminated the License Agreement.  (*See* PI Hearing Ex. 7.)

In the interim, several relevant events occurred.  First, beginning in 2004, Overbreak procured foreign patents in Anderson's name in at least four foreign jurisdictions (collectively, "Foreign Patents") .  (PI Hearing Ex. 1; PI Hearing Transcript 44:9-46:19.)  However, without notice to PhoenixArts as required by the License Agreement, Overbreak permitted the Foreign Patents to expire, with no prospect of re-filing.  (*Id.*)  It appears that Anderson did not disclose the Foreign Patents in the Bankruptcy Case.  Second, PhoenixArts was administratively dissolved under Tennessee law on September 17, 2004, was reinstated on October 27, 2004, and was again administratively dissolved (for the second and last time) on August 19, 2005.  (O'Brien Decl.  II, Ex. 1 (p. 9).)

---

[3]The Sieling Declarations do not specify the time period in which Anderson received these royalty payments, but, for purposes of this Memorandum, the court will assume that Sieling is referring to the time period from the date of the License Agreement through the last royalty payment that Overbreak made to Anderson in 2006.

On June 15, 2007, Overbreak entered into an "Assignment of Rights" with TOL, a company consisting of the same shareholders, officers, assets, and operations as Overbreak. (Sieling Decl. II ¶ 5; Docket No. 28, Ex. A.) That assignment conveyed only Overbreak's rights – not Overbreak's liabilities – and did not reference the License Agreement, let alone purport to comply with certain specific conditions of assignment set forth therein.[4] Overbreak did not obtain Anderson's approval for this purported assignment. (PI Hearing Transcript 60:19-61:3.)

Unbeknownst to Anderson, Overbreak (and later TOL) continued to manufacture and sell HoverDiscs after March 2007, albeit in limited quantities. (Sieling Decl. I ¶ 6; PI Hearing Transcript 143:12-22.)

Anderson received his bankruptcy discharge on April 10, 2007, having completed the payments under his Chapter 13 Plan, and, on August 7, 2007, the bankruptcy court closed the Bankruptcy Case. (O'Brien Decl. II, Ex. 2.) Under the Plan, Anderson had paid to the Trustee, for the benefit of his creditors, $27,705. (*Id.*)

In approximately June 2012, Anderson, believing that he possessed unfettered ownership of the Patents, approached TOL (among other toy manufacturers) to explore the possibility of re-launching the HoverDisc. (PI Hearing Transcript at 64:25-67:5.) Anderson claims that, during these negotiations, TOL essentially acknowledged that it did not have any rights under the

---

[4]TOL now contends that, under a so-styled "*Nunc Pro Tunc* Agreement of Succession," executed after this lawsuit was filed, it actually succeeded to all of the rights *and liabilities* of Overbreak on June 15, 2007, expressly including all of Overbreak's rights and obligations under the License Agreement. (Sieling Decl. II, Ex. 2 (1/29/13 *Nunc Pro Tunc* Agreement); PI Hearing Transcript 23:23-24:11.) As explained herein, TOL has not established that this document has any retroactive legal effect for purposes of this lawsuit, and it does not comply with the License Agreement assignment provisions, in any case. (*See also* Docket No. 26, Anderson's Response in opposition to TOL's Motion to Dismiss or Transfer, at p. 6 n.6.)

License Agreement and required a license from Anderson before proceeding with a new product launch in early 2013. (*Id.* at 69:10-70:1.) However, TOL asserts that it was simply seeking to revise and update the existing License Agreement during its negotiations with Anderson. (*See, e.g., id.* at 148:19-21; 175:22-177:13.)

In any event, after the parties had agreed on potential terms for a new license agreement, Anderson backed out of the prospective deal. (*See* PI Hearing Exs. 9 (draft Letter of Intent) and 12 (10/16/12 email from Anderson to Sieling); PI Hearing Transcript 70:2-3 and 74:8-21.) However, upon receiving Anderson's communication of withdrawal from the new licensing agreement, TOL responded by claiming that it had rights in the Patents all along and would proceed with its plans to re-launch the HoverDisc in early 2013. (PI Hearing Ex. 13; PI Hearing Transcript 75:3-15.)

On December 20, 2012, Anderson filed this lawsuit, claiming that TOL was liable for breach of contract, fraud, and patent infringement, for which Anderson sought immediate injunctive relief in the form of a temporary restraining order ("TRO") and/or a preliminary injunction.[5] On December 20, 2012, the court held a hearing ("TRO Hearing") and denied the request for a TRO. On February 7, 2013, the court conducted the PI Hearing, at the conclusion of which the court enjoined TOL and/or Overbreak from continuing to manufacture, market, and sell the HoverDisc.[6]

## ANALYSIS

The parties vigorously dispute various basic facts of this case, including whether

---

[5]Anderson also asserts a separate count for a declaratory judgment.

[6]The injunction was conditioned on the posting of a bond by Anderson, which Anderson accordingly posted on February 14, 2013. (Docket No. 38.)

Anderson and/or TOL are parties to the License Agreement, whether Anderson owns the Patents, and whether and when the License Agreement terminated. The court's consideration of some of these disputes impacts both the jurisdictional analysis (with respect to TOL's Motion to Dismiss or Transfer) and the merits of the underlying claims (with respect to Anderson's request for a preliminary injunction).

## I.    Parties to the License Agreement and Ownership of the Patents

The original License Agreement was made between PhoenixArts as "Licensor" and Overbreak as "Licensee."

The License Agreement permitted Overbreak to assign the agreement to a third party under either of two circumstances: (1) with the explicit consent of PhoenixArts (License Agreement ¶ 29), or (2) without PhoenixArts' consent, provided that the unilateral assignment from Overbreak include, *inter alia*, a 1% increase in royalties and an assignment of all rights and "obligations and limitations" under the License Agreement (*id.*, ¶ 2(g)).

Overbreak did not satisfy either of these conditions in its "assignment" to TOL in June of 2007. First, Overbreak did not seek consent from PhoenixArts or Anderson for the assignment. Second, Overbreak's unilateral "Assignment of Rights" did not comply with ¶ 2(g) in two respects: (1) it failed to assign its *obligations* (as well as its rights) under the License Agreement; and (2) it failed to include a provision for a 1% increase in royalties.[7] Thus, TOL is not a party to

---

[7]TOL urges the court to find that the *Nunc Pro Tunc* Agreement – purportedly signed by Overbreak and TOL on January 29, 2013 – cures any potential deficiencies in this regard retroactive to June 25, 2007. TOL does not cite to any legal authority for its position that the *Nunc Pro Tunc* Agreement, which does not recite any consideration and purports to reflect a present agreement by a company (Overbreak) that was dissolved several years ago, should retroactively confer TOL rights under the License Agreement. Given that TOL has the same shareholders and officers as Overbreak did, the court is highly skeptical that this purported

the License Agreement and cannot assert any rights thereunder.[8]

With respect to PhoenixArts, the parties vigorously dispute (a) what rights, if any, Anderson originally conveyed to PhoenixArts before it entered into the License Agreement with Overbreak; and (b) to the extent that Anderson conveyed any rights to PhoenixArts, whether those rights reverted to Anderson when PhoenixArts was administratively dissolved.[9]  Anderson has averred that, at an unspecified time, he orally granted an exclusive license to PhoenixArts to sub-license his Patents.  He also argues (and avers), without citation to any legal authority, that the license he conveyed to PhoenixArts automatically "reverted" to him upon the dissolution of PhoenixArts.  (*See, e.g.*, Verified Compl. ¶ 14 ("Upon the dissolution of PhoenixArts, all right,

agreement reflects an arms length transaction, rather than simply a *post hoc* attempt by Mr. Sieling (and the other common owners/officers of TOL and Overbreak) to justify their infringing activity retroactively.  At any rate, even if the *Nunc Pro Tunc* Agreement had retroactive legal effect, it fails to include the required 1% royalty increase and, therefore, does not constitute a valid unilateral assignment under ¶ 2(g).

[8]Whether TOL could be liable for the debts of Overbreak – if any claims against Overbreak by Anderson remain actionable – under an *alter ego* or successor liability theory may present a distinct legal question, with respect to which the court expresses no opinion.

On a separate note, ¶ 5 of the License Agreement provided that it would not renew if, upon a renewal date, the Licensee was in material breach of the agreement.  As of the second renewal date, Overbreak (and/or TOL) had let the Foreign Patents expire without notice to Anderson, in plain violation of ¶ 11(c), and had failed to cure the royalty payment deficiencies identified by Anderson, which may have constituted a violation of ¶ 6.  Also, Overbreak and TOL had not furnished royalties or provided royalty statements to Anderson from Q4 2006 forward, in violation of ¶ 2(c).  If ¶ 5 was self-executing and one or more of these breaches constituted a material breach – which appears to be the case – the agreement would have expired by its own terms on December 31, 2009, even if it had otherwise remained effective after June 2007.

[9]Until TOL filed its Reply, the court was not aware of the corporate history of PhoenixArts, including that it was administratively dissolved in September 2004, reinstated in October 2004, and administratively dissolved a second and final time in August 2005.  The courts also notes that the parties have not drawn any distinction between the legal effect of the first dissolution and the legal effect of the second dissolution.

title, interest in and to the Anderson Patents reverted to Mr. Anderson."); Anderson Decl. ¶ 4; PI

Hearing 35:19-22.)  In response, TOL points out that PhoenixArts represented that it was the sole

owner of the Patents in the License Agreement, which, it argues, creates a material issue of fact

as to whether Anderson owns the Patents.  (*See, e.g.*, License Agreement ¶¶ 1(h), 1(a), 2(c).)

TOL also argues that, if Anderson did orally convey ownership of the Patents to PhoenixArts,

then those rights never "reverted" to Anderson because PhoenixArts failed to comply with

necessary asset liquidation procedures upon its dissolution.  TOL contends that, taken together,

these disputed facts preclude a finding that Anderson is likely to prevail on the merits of his

patent infringement claims.

As an initial matter, under 35 U.S.C. § 261, assignments of a patent or patent application

must be in writing to be effective.  *See Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358 (Fed.

Cir. 2003); *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998).

Therefore, Anderson could not have validly assigned title to the Patents and Patent Applications

to PhoenixArts orally.  Thus, regardless of the language of the License Agreement, it appears that

PhoenixArts could have not have been the sole owner of the referenced Patents and Patent

Applications pursuant to an oral assignment from Anderson.  At most, PhoenixArts may orally

have received a *license* to the Patents and Patent Applications, *see Waymark*, 334 F.3d at 1364

(stating that, under appropriate circumstances, "[l]icenses may be oral"), while ownership

remained in Anderson's name.  Indeed, all three Patent Applications were filed in Anderson's

name, and all three associated Patents were issued in Anderson's name.  Moreover, two of the

Patent Applications were filed *after* PhoenixArts and Overbreak entered into the License

Agreement, the USPTO issued all of the Patents in Anderson's name, and two of these Patents

(the 151 Patent, dated February 6, 2007, and the 487 Patent, dated May 29, 2007), were not issued until *after* PhoenixArts had been administratively dissolved on August 19, 2005.

Having reviewed the License Agreement closely, it is not clear to the court whether the parties to that agreement engaged in sloppy drafting, whether PhoenixArts made an affirmative misrepresentation, or whether the agreement simply incorporates some form of mutual mistake. For example, the "Background" section on the first page of the agreement defines PhoenixArts as the "Licensor" and states that "Licensor filed on February 14, 2003 for a United States utility patent, attached hereto as Schedule A, with respect to Rigid Helium Balloons." However ,the attached "Schedule A" is a copy of the 838 Patent Application *filed by Anderson in his own name*. Accordingly, unless the court construes "Anderson" and "Licensor" synonymously in this particular context, it is difficult to understand how the language of the License Agreement can be reconciled with the 838 Patent Application attached as Schedule A, which on its face was *not* filed by PhoenixArts. At any rate, however the parties intended the License Agreement to be construed, its language would not have overridden the requirements of federal statutory law, which does not appear to recognize oral assignments of patent ownership.

Therefore, based on the existing record, the court is satisfied that Anderson currently owns the Patents, regardless of the language in the License Agreement.[10] The issues of whether Anderson conveyed an oral license to PhoenixArts and, if so, the current status of that license are disputed issues that the court need not resolve at this early stage, particularly on an undeveloped record.

---

[10]To the extent TOL's argument concerning the effect of the Bankruptcy Case on Anderson's rights can be construed as a challenge to his ownership of the Patents, the court addresses that issue in a later section.

## II.    <u>Venue</u>

TOL argues that, under the forum selection clause in the License Agreement, Anderson was required to file this lawsuit in California.  Anderson argues that he was not bound by the forum selection clause because (1) he did not agree to the venue provisions (PhoenixArts did), (2) his lawsuit falls within ¶ 19 of the License Agreement, which permits a lawsuit to be filed "in any court" of law for violations of the agreement's confidentiality provisions, and/or (3) the License Agreement terminated before he sued TOL.[11]  As set forth in the previous section, the court has found that TOL was a not a party to the License Agreement and never received a valid assignment from Overbreak.  Thus, TOL cannot enforce the forum selection clause provision in the License Agreement in the first place and, therefore, the court will not dismiss or transfer the case on that basis.[12]

Finally, TOL has not established that, absent consideration of the forum selection clause, the traditional venue factors otherwise favor transferring the case to a different venue under 28 U.S.C. § 1404(a).  In considering a § 1404(a) motion, "a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'"  *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 647 n.1 (6th Cir.

_____

[11]Here, Anderson seems to be attempting to "have his cake and eat it too": he seeks to enforce certain provisions of the License Agreement against TOL, yet argues that the venue provision – if otherwise enforceable by TOL – should not bind him.

[12]Federal courts have expressed some uncertainty as to whether Rule 12(b)(1), Rule 12(b)(3), Rule 12(b)(6), or § 1406 provides the appropriate vehicle for considering whether to enforce a forum selection clause.  In an abundance of precaution, TOL has moved under each of these provisions.  Because the court finds that TOL has no right to assert the forum selection clause in the License Agreement in the first place, the court need not address which rule(s) or statute would provide an appropriate means for its enforcement.

2002) (quoting *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991)); *Kerobo v. Sw. Clean Fuels, Corp.*, 285 F.3d 531 537 (6th Cir. 2002). The Sixth Circuit has suggested that relevant factors to consider include: (1) the convenience of the parties and witnesses; (2) the accessibility of evidence; (3) the availability of process to make reluctant witnesses testify; (4) the costs of obtaining willing witnesses; (5) the practical problems of trying the case most expeditiously and inexpensively; and (6) the interests of justice. *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). The burden is on the defendant to establish that a transfer is warranted. *Blane v. Am. Inventors Corp.*, 934 F. Supp. 903, 907 (M.D. Tenn. 1996) (citing *Factors, Etc. v. Pro Arts, Inc.*, 579 F.2d 215 (2d Cir. 1978)); *Smith*, 578 F. Supp. 2d at 958 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S. Ct. 839, 91 L. Ed. 1055 (1947)). Thus, unless the balance of these factors weighs strongly in favor the defendant seeking transfer, "the plaintiff's choice of forum should rarely be disturbed." *Id.*; *see also Smith v. Kyphon*, 578 F. Supp. 2d 954, 958 (M.D. Tenn. 2008).

Here, Anderson is a resident of Hendersonville, Tennessee, a city within this judicial district. TOL has not established that the burden on TOL of litigating in Tennessee would outweigh the burden on Anderson of litigating in California. Also, TOL has not established that the convenience of non-party witnesses, as opposed to employee witnesses, would be adversely affected by litigating the case in this court. TOL has identified only one potential material witness who is not currently employed by TOL. *See Smith*, 578 F. Supp. 2d at 963 (a party's employees' "convenience is of lesser relevance," because they "can be compelled to testify on behalf of their employer"). Moreover, that witness, Elizabeth Risha, testified at the PI Hearing in this case, demonstrating that she is capable and willing to testify voluntarily on TOL's behalf. To

12

the extent that TOL possesses business records that may be relevant to the litigation, it has not demonstrated that litigating in this forum would, in light of modern electronic discovery techniques, impose more than the ordinary costs of discovery. TOL also appears to concede that this court and a California district court are both similarly positioned with respect to issues relating to conflicts of laws and the capacity to conduct a fair trial.

Based on these considerations, the court finds that TOL has not met its burden to justify transfer of the case under § 1404(a).

## III.   <u>Standing</u>

TOL argues that Anderson lacks standing to assert his state law claims and his federal patent infringement claims. As an initial matter, based on the existing record, the court has already found that Anderson did not convey ownership of the Patents to PhoenixArts. To the extent that TOL's arguments are premised on the assumption that PhoenixArts – not Anderson – presently owns the Patents, the court rejects those arguments at this stage.

Under the Chapter 13 rules in effect when Anderson filed his petition, Anderson was required to file a schedule containing all of this assets and liabilities, including all of his legal or equitable interests in property (including intellectual property) at the commencement of the case. *See* 11 U.S.C. § 521(a)(1).[13] While his Chapter 13 Plan was being administered, Anderson was also statutorily required to declare all property acquired after the commencement of the case. *See id.* § 1306(a)(1); *In re Seafort*, 669 F.3d 662, 667 (6th Cir. 2012). The Patent Applications, Patents, and Foreign Patents at issue here each were filed and/or issued in Anderson's name

---

[13]In April 2005, Congress amended § 521 to add certain provisions, *see* PL 109-8, 2005 § 256 (2005), but those amendments did not obviate Anderson's general obligation to disclose property that constituted "property of the estate."

during the five-year pendency of his Chapter 13 Plan, yet Anderson never declared them as assets or revealed them to the Chapter 13 Trustee. It appears that they should have been, particularly where Anderson takes the position here that he always owned those assets and had merely licensed them to PhoenixArts until its dissolution.[14]

Here, TOL has a strong case that the right to recover unpaid royalties from Overbreak – *i.e.*, Anderson's right to profit from exploitation of the Patents, Patent Applications, and Foreign Patents during the time frame of the Bankruptcy Case – belonged to the bankruptcy estate. Had Anderson disclosed these assets, his plan would have been modified, and his creditors would have received more money through his Chapter 13 Plan. Indeed, by failing to disclose the royalty stream, Anderson may have defrauded his creditors.[15] As a consequence, he may lack standing to pursue those claims here.[16]

---

[14]Under Chapter 13, a debtor remains in possession of all property of the bankruptcy estate and can exercise the rights and powers of the trustee under certain circumstances. *Id.* § 1306(b) and § 1303. Here, the parties have not addressed whether the purported license to PhoenixArts was enforceable in the absence of notice to the Chapter 13 Trustee.

[15]On February 5, 2003 – one year after filing for Chapter 13 bankruptcy – Anderson filed the Articles of Organization for PhoenixArts with the Tennessee Secretary of State. On February 14, 2003, Anderson filed the first Patent Application in his own name, after which PhoenixArts claimed sole ownership of the Patents and associated Applications in the License Agreement on February 22, 2003. Anderson then collected over a million dollars in royalties from Overbreak based on exploitation of the Patents, Patent Applications, and/or Foreign Patents in his name, but he does not appear to have disclosed that income in the Bankruptcy Case. Furthermore, even after the alleged license to PhoenixArts purportedly "reverted" to Anderson when PhoenixArts was administratively dissolved, Anderson did not disclose the Patents, pending Patent Applications, Foreign Patents, and/or the associated royalty income stream in the Bankruptcy Case. Anderson now claims that he always owned these assets. Given this chain of events, if there is a reasonable explanation for Anderson's failure to disclose these assets at any point before the close of the Bankruptcy Case, it is not self-evident to this court.

[16]Even if Anderson has standing to assert claims for unpaid royalties by Overbreak, this case could present circumstances justifying an exercise of judicial estoppel to bar the contract claims. For example, courts have often found that, where a debtor unreasonably fails to declare a

14

However, the right to profit from exploitation of the Patents and Patent Applications during the pendency of the Bankruptcy Case is distinct from the ultimate legal ownership of those Patents. As discussed above, the existing record contains Patent Applications filed by Anderson and associated Patents issued to Anderson. There is no bankruptcy trustee at the moment and TOL has not established that PhoenixArts has a present claim of exclusive ownership over the Patents. Therefore, the court is not persuaded by TOL's argument that Anderson lacks standing to enforce the Patents at this point. Thus, at least at this stage, the court is satisfied that Anderson owns the Patents and can sue to protect against their infringement.[17]

## IV.  Motion for Preliminary Injunction

### A.  Standard of Review

Under Fed. R. Civ. P. 65, a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Nat'l Resources Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). Because substantive matters of patent infringement are unique to patent law, the estimated likelihood of success in establishing infringement is governed by Federal Circuit law. *Revision Military ,Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012).

---

viable cause of action as a contingent asset in Chapter 13 proceedings, that debtor may be judicially estopped from asserting that cause of action following the close of a bankruptcy case. *See, e.g.*, *Richardson v. United Parcel Service*, 195 B.R. 737, 738-39 (E.D. Mo. 1996).

[17]It may be that, if the bankruptcy court were to reopen the Bankruptcy Case, Anderson's interests in the Patents could be subject to those proceedings and the bankruptcy trustee could seek to intervene in this case as the real party in interest. Nevertheless, the Bankruptcy Case was closed several years ago, and the record here contains three patents applied for and issued in Anderson's name.

Under that standard, a movant seeking a preliminary injunction can establish a sufficient likelihood of success on the merits by showing that success is more likely than not. *Id.* "[T]he weight of the likelihood may be considered as an equitable factor, along with issues of the position of the parties with respect to the status quo, in the ultimate balance of equities." *Id.*

**B.    Application**

1.    Likelihood of Success on the Merits

Under 35 U.S.C. § 271, anyone who, "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." In its briefing, TOL argues that there are questions of fact as to whether Anderson owns the Patents, whether the Patents are valid, and whether the HoverDiscs in question constitute infringing devices. Under 35 U.S.C. § 282, an issued patent comes with a statutory presumption of validity at every stage in litigation. *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1319-27 (Fed. Cir. 2008). Only if an alleged infringer raises a substantial question concerning the validity of the patent as an affirmative defense must the party seeking injunctive relief establish that the invalidity defense lacks merit. *Id.* at 1327-28. If an infringer is unable to "identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998). To overcome the presumption of validity, defendants must show invalidity "by clear and convincing evidence." *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed. Cir. 1987).

As set forth above, the court has found that Anderson currently owns the Patents and can sue to protect against their infringement. Furthermore, based on the existing record, TOL has not

presented a viable argument that the Patents are invalid. Also, TOL's argument that manufacture and sale of HoverDiscs would not infringe the Patents strikes the court as disingenuous, given that TOL's position is that it had a valid and exclusive license to exploit the Patents under the License Agreement in the first place. Instead, the existing record establishes that TOL does not, and did not, have a right to exploit the Patents, yet it utilized the Patents in the manufacture and sale of the HoverDisc toy from June 2007 forward, including current marketing efforts and a projected "re-launch" of the product in 2013. Thus, Anderson has demonstrated that he is reasonably likely to succeed on the merits of his claim that TOL was infringing the Patents.[18]

## 2. Irreparable Harm

"[T]he irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Id.* (citing *Abbott Labs v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008)); *Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996).[19]

---

[18]The preliminary injunction is premised on TOL's infringing activity only. Therefore, for purposes of Rule 65, the court does not address the likelihood that Anderson will succeed on the merits of his claims other than the patent infringement claims.

[19]In *Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552 (Fed. Cir. 1994), the Federal Circuit stated that a strong showing of a reasonable likelihood of success entitles the patentee to a presumption of irreparable harm. However, following the Supreme Court decision in *eBay Inc. v. MercExchange*, *L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006), some federal districts courts have found that the *Reebok* presumption no longer applies and that the burden remains on the patentee to present sufficient evidence of irreparable harm, *see Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1306-1307 (D. Utah 2008) (collecting cases), while other district courts have continued to apply the presumption. *See*, *e.g.*, *Domino's Pizza Franchising, LLC v. Yeager*, No. 09-14704, 2010 WL 374116, at *4 (E.D. Mich. Jan. 25, 2010). Here, Anderson did not argue that a presumption applies, the parties did not brief the issue, and

At the evidentiary hearing, Anderson offered persuasive testimony on all of these points. Anderson testified that he has been seeking to utilize his Patents for a re-launch of the HoverDisc or a similar toy with other toy manufacturers, but the inability to demonstrate that he can offer an exclusive license for the Patents is preventing him from entering into any deals. Anderson also testified that TOL recently has been producing HoverDiscs of poor quality, thereby diminishing the potential value of Anderson's Patents. He also testified that TOL has been marketing the HoverDiscs at a lower effective retail price than Overbreak did previously, which reduces the profit margin on each sale and thereby makes the Patents less valuable to other companies. Anderson testified that Overbreak's continuing use of his Patents threatened to degrade the value of those Patents to such a degree that other companies might not do business with him at all.[20] In light of this testimony, the court finds that Anderson has established that he will suffer multiple forms of irreparable harm if TOL does not cease its infringing activity.

### 3. The Balance of Hardships

With respect to the balance of hardships, a district court "must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988). Where the harm to an alleged infringer from a preliminary

---

Anderson demonstrated with affirmative evidence that he is likely to suffer irreparable harm in the absence of an injunction for the reasons set forth herein. Therefore, application of the *Reebok* presumption would make no difference here, and the court need not consider its continuing validity post-*eBay*.

[20]In oral argument, TOL characterized Anderson's claims of irreparable harm as "laughable" and emphasized that Anderson stood to earn a lot of money if TOL proceeded with its early 2013 re-launch of the HoverDisc. (*See, e.g.*, PI Hearing Transcript at 29:8-9 and 131:21-132:15.) However, even if Anderson could profit from doing business with TOL, that fact would not obviate the irreparable harm caused by infringement of his Patent rights.

injunction is self-inflicted, courts typically find that such harm is a natural consequence of infringing activity that does not weigh against issuance of an injunction. *See, e.g.*, *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983) (injunction warranted, where infringing party took a "calculated risk" that it might infringe patents at issue); *i4i Ltd. P'ship, v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010) ("[N]either commercial success, nor sunk development costs, shield an infringer from injunctive relief . . . . [The infringer] is not entitled to continue infringing simply because it successfully exploited its infringement."); *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) (district court did not abuse discretion in refusing to consider infringer's expenses for designing and marketing the infringing product); *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."); *Smith & Nephew, Inc. v. Synthes (U.S.A.)*, 466 F. Supp. 2d 978, 984-85 (W.D. Tenn. 2006) (finding that impact of ceasing operations related to infringing product did not weigh in favor of infringer, where such hardship "is the consequence of a patent infringement"); *Zen Design Grp. Ltd. v. Clint*, No. 08-cv-14309, 2009 WL 4050247, at *6 (E.D. Mich. Nov. 23, 2009) ("The hardship to [the infringer] in enjoining him from selling the infringing product is of his own creation and should be not be considered in the analysis.").

Here, the balance of hardships favors Anderson. To the extent TOL incurs damages from ceasing its manufacturing and marketing efforts for the HoverDisc, that harm is self-inflicted and is the natural consequence of its infringing activity. TOL acted without a valid license to exploit the Patents and continued to press forward with its projected 2013 re-launch of the HoverDisc,

even after Anderson appropriately challenged TOL's right to exploit the Patents.[21]

By contrast, as explained in the previous section, the hardships to Anderson from TOL's infringing activity were substantial, threatening to cause irreparable harm to Anderson if TOL continued to market and sell the HoverDisc as planned. Accordingly, the balance of hardships weighs strongly in favor of Anderson.

### 4. Public Interest

The patent statute, 35 U.S.C. § 261, which exercised power granted to Congress by the United States Constitution, Art. I § 8, cl. 8, reflects a strong public policy interest in "promot[ing] the progress of the useful arts." *Smith*, 718 F.2d at 1557; *see also PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996) (noting "the strong public policy favoring the enforcement of patent rights"). This factor favors enforcement of the Patents against infringing activity by TOL.

### 5. Conclusion

Anderson has justified the issuance of a preliminary injunction against TOL to restrain it from infringing his Patents.

## V. Motion for Leave to File Motion for Partial Summary Judgment

Anderson seeks leave to file a motion for partial summary judgment on the following

---

[21]Indeed, based on the existing record, it appears that TOL initially recognized that it did not have a valid license to the Patents. Only *after* Anderson backed out of the proposed licensing deal did TOL claim to have possessed a license all along. At any rate, even if TOL ultimately proves to be correct that Anderson lacks standing to sue for patent infringement or is otherwise barred from asserting the infringement claims – a position that the court finds unpersuasive at this stage – it appears that TOL does not and never had a valid right to utilize the Patents in the first place. Thus, regardless of which entity or entities ultimately prove to be the appropriate parties in interest, TOL's utilization of the Patents was likely unlawful, and the damage it will have incurred from ceasing that activity will have been self-inflicted.

three issues: (1) the License Agreement was terminated; (2) TOL has no rights under the License Agreement; and (3) TOL infringed the Patents. In response, TOL argues that the motion is premature, because there are substantial disputes concerning these and other material facts that will require discovery. TOL argues, *inter alia*, that the facts will show that Anderson lacks standing to bring some or all of his claims, that Anderson will not be able to demonstrate that TOL actually infringed the Patents, and that the Patents may be invalid in light of *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007).

As an initial matter, the court's findings herein have been made under the Rule 65 standard, which does not preclude the parties from addressing those issues at a later stage in the case upon a complete evidentiary record. Furthermore, this case presents a myriad of factual and legal issues that require discovery and/or further consideration by the parties.[22] Thus, even to the extent that Anderson seems likely to prevail on certain facts – such as the lack of a valid assignment to TOL – the court perceives minimal benefit from considering a partial summary judgment motion at this early stage. Accordingly, the court will deny the motion without prejudice.

## CONCLUSION

For the reasons stated herein, Anderson's Motion for Preliminary Injunction was granted, TOL's Motion to Dismiss or Transfer will be denied without prejudice, and Anderson's Motion for Leave to File a Motion for Partial Summary Judgment will be denied without prejudice.

---

[22]For instance, both parties appear to have played fast and loose with the rights and obligations of their previous related companies – PhoenixArts vis-a-vis Anderson and Overbreak vis-a-vis TOL – leading to disputes about the legal effect of certain past acts and omissions.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge